PEOPLE v SAMMONS

Docket No. 115051. Submitted August 6, 1991, at Lansing. Decided October 7, 1991, at 9:10 A.M. Leave to appeal denied, 439 Mich 933.

Martin H. Sammons was convicted by a jury in the Bay Circuit Court, William J. Caprathe, J., of possession with intent to deliver and conspiracy to deliver 225 grams or more, but less than 650 grams, of cocaine. He was sentenced to a term of twenty to thirty years' imprisonment for each offense, to be served consecutively. He appealed by leave granted.

The Court of Appeals *held:*

1. The defendant is entitled to a new entrapment hearing because his Sixth Amendment right of confrontation was violated when the trial court permitted the police informant who arranged the drug sale and accompanied a police officer during the sale to wear a mask and conceal his true identity while testifying. The protections afforded by the Confrontation Clause are available to a defendant at an entrapment hearing, and, because the mask precluded the trial judge from adequately observing the witness' demeanor when testifying, the defendant was denied a critical aspect of his confrontation rights.

2. The preclusion of information identifying the informant witness without making a finding whether the defendant possessed sufficient information with which to place the witness in the proper setting to enable further testing of credibility effectively emasculated the defendant's right of cross-examination.

3. The prosecution was not entitled to withhold the identity of the informant witness under the "informer's privilege." Where the disclosure of an informer's identity is relevant and helpful to the defense of an accused or, as in this case, is relevant to a fair determination of a cause, the privilege must give way.

4. The court did not err in refusing to accept the defendant's plea of nolo contendere to the possession charge in exchange

REFERENCES

Am Jur 2d, Criminal Law §§ 552, 886, 956, 957, 1002-1004.

Conditions interfering with accused's view of witness as violation of right of confrontation. 19 ALR4th 1286.

for dismissal of the conspiracy charge where the prosecutor objected to the arrangement.

5. The evidence was sufficient to support a finding of guilt of possession of the cocaine either as a principal or as an aider and abettor. Therefore, reversal on the ground that the jury failed to specify on which of the two theories its decision was based is not required.

6. The jury instructions were proper.

7. The imposition of consecutive sentences for the convictions of possession with intent to deliver and conspiracy to deliver the same cocaine does not violate the constitutional prohibitions against double jeopardy and is not contrary to the intent of the Legislature.

8. The mandatory twenty- to thirty-year sentences do not constitute cruel and unusual punishment. Nevertheless, the defendant's sentences are vacated, and, in the event his convictions are affirmed on remand, he must be resentenced under the amended sentencing provisions of the controlled substances section of the Public Health Code pursuant to *People v Schultz,* 435 Mich 517 (1990).

9. If the trial court determines on remand that the defendant was not entrapped, his convictions are to be affirmed and he is to be resentenced in accordance with *Schultz.* If an entrapment hearing is not held, or the court finds that the defendant was entrapped, his convictions are to be reversed and the charges dismissed.

Remanded.

1. CRIMINAL LAW — ENTRAPMENT — RIGHT TO CONFRONT WITNESSES.

The protections afforded by the Confrontation Clause of the Sixth Amendment are available to a defendant at a hearing held to determine whether the defendant was entrapped; the central concern of the Confrontation Clause is to ensure the reliability of the evidence against the defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact (US Const, Ams VI, XIV).

2. CRIMINAL LAW — RIGHT TO CONFRONT WITNESSES — FACE-TO-FACE CONFRONTATION.

A face-to-face confrontation, while preferable, is not an indispensable element of the right to confront one's accusers, and the preference must occasionally give way to considerations of public policy and the necessities of the case; where necessary to further an important state interest, a procedure not involving face-to-face confrontation may be employed where the proce-

dure ensures the reliability of the evidence by subjecting it to rigorous adversarial testing, thereby preserving the essence of effective confrontation; important elements of confrontation to be preserved include an oath, cross-examination, and observance of the witness' demeanor.

3. CRIMINAL LAW — RIGHT TO CONFRONT WITNESSES — LIMITATION OF IDENTIFYING INFORMATION.

Limitation of cross-examination with regard to identifying information of a witness is not error where there is sufficient reason for nondisclosure and the defendant is possessed of sufficient other information with which to place the witness in the proper setting, thus enabling the defendant to test the credibility of the witness.

4. CRIMINAL LAW — WITNESSES — INFORMER'S PRIVILEGE.

The privilege that entitles the government to preserve the anonymity of citizens who have furnished information concerning violations of the law to law enforcement officers does not apply where the disclosure of the informer's identity or the contents of the communication is relevant and helpful to the defendant's defense or is essential to a fair determination of the cause.

5. CRIMINAL LAW — JURY — VERDICTS — ALTERNATIVE THEORIES.

The failure of a jury to indicate whether it was convicting a defendant as a principal or as an aider and abettor does not require reversal of the conviction where the jury was instructed that it could find the defendant guilty as either and the evidence was sufficient to support a finding of guilt under either of the theories.

6. SENTENCES — CONSECUTIVE SENTENCES — DOUBLE JEOPARDY.

The imposition of consecutive sentences for convictions of possession with intent to deliver cocaine and conspiracy to deliver the same cocaine does not violate the prohibitions against double jeopardy and is not contrary to the intent of the Legislature (US Const, Ams V, XIV; Const 1963, art 1, § 15; MCL 333.7401[2][a][ii],[3], 750.157a; MSA 14.15[7401][2][a][ii],[3], 28.354[1]).

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *George B. Mullison,* Prosecuting Attorney, and *Martha G. Mettee,* Assistant Prosecuting Attorney, for the people.

Martin H. Sammons, in propria persona, and

State Appellate Defender (by *Ronald E. Steinberg*), for the defendant on appeal.

Before: MacKenzie, P.J., and Reilly and Connor, JJ.

Reilly, J. Defendant was convicted by a jury of possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine, MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii), and conspiracy to deliver 225 grams or more, but less than 650 grams, of cocaine, MCL 750.157a; MSA 28.354(1). On September 6, 1988, defendant was sentenced to a term of twenty to thirty years of imprisonment for each offense, to be served consecutively. On March 27, 1989, this Court granted the defendant's application for a delayed appeal. We remand for proceedings consistent with this opinion.

At trial, Officer Buczek of the Bay City Police Department testified that on December 4, 1987, he and a police informant went to the Imperial Hotel in Bay City, Michigan, for the purpose of buying one pound of cocaine. Buczek and the informant were admitted into a hotel room by defendant, who was accompanied by codefendants Alan Stone and James Wallace. Defendant told the informant that the "shit" was in the bathroom. While the defendant and the informant went into the bathroom, Buczek remained in the room with Stone and Wallace, who discussed the problems associated with obtaining such a large quantity of cocaine. After defendant and the informant came out of the bathroom, defendant gave the informant a "sample" from a small pile on a night stand. The informant tasted the sample and indicated that it was "good." Buczek then told defendant the money was in the car. Defendant pointed to Stone and

said, "[H]e's the money man." Stone told Buczek to get the money, which he did. Defendant commented that he hoped the bills were not little. After Stone counted the money, Wallace went outside to get "the product." Defendant told Buczek, "[W]e don't like to keep the coke and the money in the room at the same time."

After Wallace left the room, other police officers arrived and the suspects were arrested. Wallace was arrested after entering a van parked outside the hotel room. A warrant was secured to search the van, and the police discovered a sealed package under one of the seats. This package, along with the material from the night stand, and a packet that was seized from Stone were turned over to the Michigan State Police for testing. Analysis of the materials indicated that all three contained cocaine. Defendant, Wallace, and Stone were all charged with conspiracy to deliver 225 grams or more, but less than 650 grams, of cocaine, and possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine.[1]

Defendant, along with Wallace and Stone, raised the issue of entrapment before trial, and extensive hearings were conducted from May 4, 1988, through June 7, 1988. Defendant testified and identified the informant who accompanied Officer Buczek during the drug sale as a person he knew merely as "Rick." Defendant claimed that Rick set up the drug sale and pressured him into participating. The prosecution called Rick to rebut the defendant's allegations. Over defendant's objection, Rick was permitted to testify while wearing a

---

[1] Codefendant Stone also was charged with possession of less than fifty grams of cocaine. Additional charges of possession of less than fifty grams of cocaine, carrying a concealed weapon, and possession of a firearm during the commission of a felony also were filed against codefendant Wallace.

mask and without disclosing his true identity. Rick denied either pressuring or threatening defendant, and the trial court found no entrapment.

Codefendants Wallace and Stone eventually pleaded guilty of possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine in exchange for the dismissal of the remaining charges against them. The defendant, however, declined a similar plea offer, electing instead to go to trial. At the subsequent trial, Rick was not called as a witness. Following trial, defendant was convicted by a jury of both counts as charged. This appeal followed.

Defendant on appeal has raised a host of issues addressing pretrial procedure, trial procedure, and sentencing. We will review each of them.

I

The first issue we have been asked to decide is whether the defendant's Sixth Amendment right of confrontation was violated when the trial court permitted Rick, the prosecution's chief witness, to testify at the entrapment hearing while wearing a mask, and without disclosing his true identity.

The Confrontation Clause of the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, *Pointer v Texas,* 380 US 400; 85 S Ct 1065; 13 L Ed 2d 923 (1965), guarantees to a criminal defendant the right, "[i]n all criminal prosecutions, . . . to be confronted with the witnesses against him." The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v Craig,* 497 US —; 110 S Ct 3157; 111 L Ed 2d 666 (1990).

A

At the entrapment hearing, defendant testified that he first met Rick at a "dope house" approximately eight months before he was arrested. Defendant claimed that until November 16, 1987, he saw Rick about once a week at various dope houses where they would "do" cocaine together. Beginning on November 16, defendant said, Rick began telephoning him repeatedly, up to ten times a day, trying to persuade him to sell cocaine. At first Rick asked for two ounces, and then a pound. Defendant said he kept trying to put Rick off and told him that he didn't want to sell cocaine. Rick kept calling though, telling defendant that he had spent $1,500 "profit money," and that his people were "putting the heat on him." Further, defendant was told that if he did not help out, Rick would have his people "put the heat" on defendant. Defendant said he finally agreed to help because Rick was desperate and in trouble. Defendant said that although he was a cocaine addict, and knew people who "turn dope," he was not a drug dealer.

Defendant's sister corroborated defendant's testimony, claiming that Rick called approximately seventy times during the last two weeks in November 1987. She said Rick called one time "hollerin' " that his people were upset because defendant had not shown up with two ounces of cocaine. He told her that defendant "better come through or else."

In rebuttal, the prosecution called Rick as a witness. At the prosecutor's request, and over defendant's objection, Rick was permitted to testify while wearing a mask, and defense counsel was instructed that he could not ask any identifying questions of Rick. The court, however, did allow admission of Rick's criminal record, but with iden-

tifying information struck therefrom. The justification for these procedures was that either defendant or one of his codefendants had allegedly offered someone a quarter pound of cocaine to kill Rick.[2]

According to Rick, beginning in October 1987, he and a friend made several trips from Bay City to Detroit, where they bought drugs from defendant's younger brother and then defendant. In mid-November, after Rick's fifth trip to Detroit, the police searched Rick's house and discovered cocaine. Although Rick was not arrested, he was given a card with a phone number to call at the police department if he wanted help with his "situation." Consequently, Rick contacted the police and volunteered to assist them in catching his suppliers. Rick said he called both defendant and another source, identified as "Jim," about arranging a delivery of two ounces of cocaine to Bay City. Although Rick thought defendant and Jim were working together, Jim delivered the drugs in late November without defendant. Rick then called defendant to arrange for a sale of one pound of cocaine. Rick said he made numerous telephone calls to arrange the deal.

According to Rick, there was never any resistance by defendant to the sale, and he never put any pressure on defendant, whether by threats or appeals for his own safety. Rick said he was in constant contact with the police and discussed each phone call with them. Officer Buczek testified

[2] A second confidential informant, who also was permitted to testify while wearing a mask, testified regarding the alleged threat. The witness claimed that while he was in jail with codefendant Wallace, he told Wallace that he knew Rick. After Wallace contacted codefendant Stone with this information, Wallace told the witness he would give him a quarter pound of cocaine if he had Rick "taken care of" and brought him a body part. The witness then contacted Stone to verify this information, and Stone told him, "You bring me his dick, you got a QP. I got it right here."

that Rick was closely supervised through the use of in-person meetings and phone consultations. Although Rick testified that he was not promised anything for his cooperation, the prosecutor eventually stipulated that Rick was told that the police would inform the prosecutor of his cooperation, and that the more help he provided, the more they "could talk."

At the conclusion of the entrapment hearing, the trial court made extensive findings, reflecting acceptance of the testimony of Rick and the police. The court found that defendant had sold drugs to Rick before Rick's involvement with the police, that defendant had indicated a willingness to deliver drugs to Bay City, that there was no improper inducement of Rick's cooperation and no improper pressuring of defendant, and that Rick had been adequately supervised. Thus, the court concluded that there had been no entrapment.

B

Defendant now argues, as he did below, that his Sixth Amendment right of confrontation was violated through the use of the mask because he was prevented from confronting his accuser face-to-face and because the trial judge, as the trier of fact, was prevented from adequately assessing the witness' credibility, a major issue in the entrapment hearing. Defendant also argues that his right of confrontation was violated when the trial court precluded cross-examination regarding identifying information.

The prosecution claims that the masking of its chief witness and the withholding of identifying information did not violate the Confrontation Clause because an entrapment hearing is not a trial involving the ultimate issue of guilt or innocence.

In Michigan, the issue of entrapment is decided by the trial court, after a separate evidentiary hearing, rather than by a jury.[3] *People v Jamieson,* 436 Mich 61, 80; 461 NW2d 884 (1990); *People v D'Angelo,* 401 Mich 167, 176-177; 257 NW2d 655 (1977).

In *D'Angelo,* at 176, our Supreme Court explained that such a procedure does not violate a defendant's Sixth Amendment right to a jury trial:

> A court determination of entrapment does not deprive the defendant of the Sixth Amendment right to trial by jury. The focus of the entrapment inquiry under the objective test is upon the nature of the police conduct. The guilt or innocence of the defendant is irrelevant to that determination. A decision whether entrapment has occurred will involve the court's evaluation of the government conduct which resulted in the charges against the defendant. Should the court determine that the government did not engage in impermissible conduct, the guilt or innocence of the defendant will be decided by the jury.

Moreover, because a defendant who asserts an entrapment claim occupies an accusatorial posture, the burden of proving the charge properly may be placed on the defendant. *Id.* at 180.

However, in *Kentucky v Stincer,* 482 US 730; 107 S Ct 2658; 96 L Ed 2d 631 (1987), the United States Supreme Court considered a prosecutor's contention that the protections afforded by the Confrontation Clause could not extend to a pretrial hearing. In that case, the defendant argued that his exclusion from the hearing to determine the competency of child witnesses violated his Sixth Amendment confrontation rights. Noting

---

[3] This is contrary to the procedure of the federal system which, unlike Michigan, adheres to the subjective theory of entrapment and allows the issue to be raised at trial and presented to the jury.

that the defendant was permitted under Kentucky law to move for reconsideration of the competency determination after the child witnesses testified at trial, the Supreme Court found that the defendant's rights under the Confrontation Clause had not been violated, given the opportunity for full and effective cross-examination during trial as a means of establishing incompetency to testify, as well as undermining credibility. *Id.* at 743-744.

We do not believe that the irrelevance of a defendant's guilt or innocence in resolving an entrapment claim renders the protections afforded by the Confrontation Clause inapplicable to an entrapment hearing. As we have already noted, the central concern of the Confrontation Clause is to ensure the reliability of evidence by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Craig, supra.* While an entrapment hearing may not be a criminal prosecution involving the assessment of guilt or innocence, it remains, like a criminal trial, adversarial in nature and requires the resolution of factual issues by a trier of fact. Like at a trial, evidence is presented and testimony given.

We believe the interests involved in ensuring the reliability of evidence at a trial also apply to an entrapment hearing. Indeed, a defendant who claims entrapment, because he essentially concedes commission of the offense charged, is likely to view resolution of the entrapment issue more critically than he views a trial of his guilt or innocence. Further, unlike the situation in *Stincer,* a defendant in Michigan may not renew the entrapment issue at trial. Thus, to deny the protections afforded by the Confrontation Clause to a defendant at an entrapment hearing would be to deny him the opportunity to ensure that the evidence presented against him, which may defeat his

claim of entrapment and remove any impediment to a subsequent trial and conviction, "is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig,* 111 L Ed 2d 678-679. Finally, we believe it would be fundamentally unfair, and contrary to principles of due process, to allow the state to present evidence designed to defeat a defendant's claim of entrapment and at the same time restrict the defendant's ability to effectively examine the reliability of such evidence.

Accordingly, for the foregoing reasons, we conclude that the protections afforded by the Confrontation Clause were available to defendant at the entrapment hearing as a means of ensuring the reliability of evidence submitted against him.

C

We must now decide whether defendant's confrontation rights were violated by the procedures employed at the entrapment hearing.

The United States Supreme Court has emphasized a defendant's right under the Confrontation Clause to a face-to-face meeting with witnesses appearing before the trier of fact. *Coy v Iowa,* 487 US 1012, 1016; 108 S Ct 2798; 101 L Ed 2d 857 (1988). The symbolic purposes served by such an encounter are explained in *Coy,* at 1017-1019:

> [T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as "essential to a fair trial in a criminal prosecution." . . .
>
> . . . A witness "may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts." . . . It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is

told, it will often be told less convincingly. [Citations omitted.]

Thus, in *Coy,* the Supreme Court held that a defendant's right to a face-to-face confrontation was violated where a large screen was placed between the testifying witness and the defendant.

In *Craig,* however, decided after *Coy,* the Supreme Court reaffirmed the importance of face-to-face confrontation, but held that it was not an indispensable element of the right to confront one's accusers. *Craig,* 111 L Ed 2d 681. The Court held that the "preference" for face-to-face confrontation must occasionally give way to considerations of public policy and the necessities of the case. *Id.* Therefore, when necessary to further an important state interest, "the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." *Id.* at 686.

Thus, in *Craig,* the Supreme Court held that the defendant's confrontation rights were not violated in a child sexual abuse case where the child victim was permitted to testify outside the defendant's physical presence by one-way closed-circuit television. The Court found that an important state interest was involved (protection of a child witness from trauma caused by testifying in the physical presence of the defendant), while also noting that the procedure employed preserved other important elements of the confrontation right, i.e., oath, cross-examination, and observance of the witness' demeanor. *Id.* at 682.

In the present case, the prosecution's chief witness was permitted to testify while wearing a

mask that covered both his face and head.[4] Like the presence of a screen in *Coy*, a full-face mask tends to diminish the aspect of personalization associated with testifying about a defendant "to his face." Thus, it may very well make a witness "feel quite differently" than when he has to repeat his story while looking at the defendant. Moreover, to the extent that facts are distorted, they may be discerned more easily in a face-to-face confrontation.

It is suggested that the presence of threats against the witness justified the masking procedure in order to further an important state interest in promoting the safety of witnesses. We do not doubt that a state has a valid interest in promoting the safety of witnesses at criminal proceedings. Further, we agree that a trial court generally would be justified in taking certain protective measures where evidence of threats or other reasonable concerns for a witness' safety are present. However, as *Craig* instructs us, the Confrontation Clause requires that any procedures devised to protect a witness must be tailored to preserve the essence of effective confrontation by ensuring the reliability of evidence in the face of rigorous adversarial testing.

As noted above, the procedure used in *Craig* (testimony by closed-circuit television) was found to be adequate even though the witness did not have to testify while facing the accused, because it preserved other important elements of confrontation, i.e. oath, cross-examination, and observance of the witness' demeanor. In this case, however,

---

[4] *Defense Counsel:* I ask the record to reflect also that the witness is wearing a ski mask or some type of mask where his face and head are not visible.

*The Prosecutor:* That's correct.

*The Court:* It may so show.

while the presence of the mask appears to have allowed the witness to observe the defendant, it foreclosed the opportunity for the trier of fact to adequately assess the witness' credibility through observation of demeanor.

In one of its earliest cases interpreting the Confrontation Clause, the Supreme Court noted that a primary object of the Confrontation Clause was to compel the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v United States,* 156 US 237, 242-243; 15 S Ct 337; 39 L Ed 409 (1895).

Indeed, our own Supreme Court also has recognized the importance of demeanor evidence:

> Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words. [*People v Dye,* 431 Mich 58, 65; 427 NW2d 501 (1988).]

Moreover, as observed in *United States v Walker,* 772 F2d 1172, 1179 (CA 5, 1985), "The facial expressions of a witness may convey much more to the trier of facts than do the spoken words."

Here, there is no doubt that credibility was the major issue at the entrapment hearing. The defendant's testimony tended to show that he agreed to the drug sale only after being repeatedly pressured with persistent telephone calls, threats, and appeals to his sympathy and friendship. Such allegations, standing alone, were sufficient to establish a claim of entrapment. See *Jamieson, supra* at 89. Through its masked witness, however, the prosecu-

tion was able to refute each of the defendant's allegations. Ultimately, the trial judge accepted the testimony of the masked witness over that of defendant in concluding that there had been no entrapment.

Because the masking of the prosecution's chief witness precluded the trial judge from adequately observing the witness' demeanor when testifying, we are constrained to find that the procedure of masking denied defendant a critical aspect of his confrontation rights. *Craig, supra.*

D

We also find that it was a violation of defendant's confrontation rights to completely preclude disclosure of identifying information.

The ability to identify and "place" one's accusers has been recognized as an important aspect of confrontation. In *Smith v Illinois,* 390 US 129; 88 S Ct 748; 19 L Ed 2d 956 (1968), the United States Supreme Court reversed the conviction of a defendant accused of illegally selling narcotics where he was prevented from cross-examining the principal prosecution witness regarding his name or where he lived. The Supreme Court stated:

> [W]hen the credibility of a witness is in issue, the very starting point in "exposing falsehood and bringing out the truth" through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself. [*Id.* at 131.]

Also see *Alford v United States,* 282 US 687; 51 S Ct 218; 75 L Ed 624 (1931).

Trial courts do, however, have discretion to place limits on cross-examination where questions are intended merely to harass, annoy, or humiliate the witness, or where inquiries would tend to endanger the personal safety of the witness. See *People v Paduchoski,* 50 Mich App 434, 438; 213 NW2d 602 (1973).

In *People v Pleasant,* 69 Mich App 322; 244 NW2d 464 (1976), this Court discussed the underlying concerns relative to limiting cross-examination regarding identifying information, including the extent to which limitations can be imposed. Adopting the reasoning of the United States Court of Appeals for the Fifth Circuit in *United States v Alston,* 460 F2d 48 (CA 5, 1972), this Court held that the prejudice to be protected against is the prejudice resulting from a denial of the opportunity for the defendant to "place the witness in his proper setting." *Pleasant, supra* at 327. Accordingly, reversal for failure to disclose certain identifying information will not be required under *Smith* or *Alford, supra,* where there is both sufficient reason for nondisclosure and the defendant is possessed of sufficient other information with which to place the witness in his proper setting, thus testing his credibility. *Pleasant, supra* at 327-328.

Here, while we agree that the trial court would have been justified in limiting cross-examination regarding identifying information in light of the alleged threats, it instead precluded all such cross-examination altogether. Moreover, while we note that defendant's testimony does suggest some familiarity with the witness' background, the trial court failed to make any findings regarding what information defendant possessed or whether defendant possessed sufficient information with which to "place the witness in his proper setting" so as to

enable further testing of credibility. *Pleasant, supra.* Absent such findings, the trial court's total foreclosure of identifying information "effectively emasculated" defendant's right of cross-examination. *Smith, supra.*

We reject the prosecution's claim that it was entitled to withhold the identity of its chief witness under the so-called "informer's privilege." As explained in *Roviaro v United States,* 353 US 53, 59; 77 S Ct 623; 1 L Ed 2d 639 (1957), this privilege entitles the government to preserve the anonymity of citizens who have furnished information concerning violations of the law to law enforcement officers, thus encouraging them to communicate such knowledge to the police. Even then, however, the privilege is not absolute:

> The scope of the privilege is limited by its underlying purpose. . . .
> . . . Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. [*Id.* at 60-61.]

In the present case, the prosecution's witness was an actual participant in the underlying transaction, rather than a mere supplier of information. Moreover, his testimony was essential to a fair determination of the issue of entrapment. Thus, the informer's privilege does not apply.

E

In sum, we conclude that the masking of the prosecution's chief witness, as well as the complete

prohibition of disclosure of identifying information, violated the defendant's rights of confrontation. Accordingly, we hold that defendant is entitled to a new entrapment hearing, consistent with this opinion.

Despite our resolution of the entrapment issue, we still find it necessary to review the defendant's remaining issues on appeal.

II

Defendant argues that the trial court abused its discretion when it refused to accept his pretrial offer to plead nolo contendere to the charge of possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine. We disagree.

On June 23, 1988, defendant appeared before the trial court in connection with the prosecutor's offer to dismiss the conspiracy charge in exchange for a plea of guilty of possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine. Contrary to the prosecutor's offer, however, defendant insisted on pleading nolo contendere rather than guilty. When the prosecutor would not agree to such a plea, defendant elected to go to trial on both charges.[5]

Acceptance of a nolo contendere plea is a matter of grace, not of right. *People v Lakin,* 52 Mich App 437, 440; 217 NW2d 452 (1974). A defendant may enter a plea of nolo contendere only with the court's consent. MCR 6.301(B), formerly MCR

---

[5]   *Defendant:* Yes, I wanta plea [sic] nolo contendere.
     *The Court:* Or else you'd rather go to trial.
     *Defendant:* Trial, yes.
     *The Court:* All right, then the prosecution doesn't wish to make that offer, so then we're left with no other choice then but to go to trial. Is that your desire.
     *Defendant:* Yes. Yes.

6.101(F). In this case, while the trial court had the discretion to accept a plea of nolo contendere to the charged offense of possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine, *Genesee Prosecutor v Genesee Circuit Judge,* 391 Mich 115; 215 NW2d 145 (1974), it did not have the authority to accept such a plea, over the prosecutor's objection, in exchange for the dismissal of the conspiracy charge. *People v Heiler,* 79 Mich App 714, 718; 262 NW2d 890 (1977). Accordingly, we find no error.

III

We now turn to consideration of defendant's trial-related issues.

First, with regard to the charge of possession with intent to deliver cocaine, the jury was instructed that it could find defendant guilty either as a principal or as an aider and abettor. Defendant contends that the evidence was insufficient to support a finding of guilt under one or both of these theories and argues, therefore, that the jury's failure to specify on which of the two theories its decision was based requires reversal. See *People v Acosta,* 153 Mich App 504, 510; 396 NW2d 463 (1986), citing *People v Gilbert,* 55 Mich App 168, 174; 222 NW2d 305 (1974).

In reviewing a claim of insufficient evidence, this Court views the evidence in a light most favorable to the prosecution and determines whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Petrella,* 424 Mich 221, 268-270; 380 NW2d 11 (1985).

In this case, defendant argues that the evidence was insufficient to prove the element of possession,

i.e., that he either possessed the cocaine or aided and abetted in its possession. We disagree.

Possession may be either actual or constructive, and may be joint as well as exclusive. *People v Hill,* 433 Mich 464, 470; 446 NW2d 140 (1989); *People v Richardson,* 139 Mich App 622, 625; 362 NW2d 853 (1984). Constructive possession may be found where a defendant knowingly has the power and intention to exercise dominion or control over a substance, either directly or through another person, or if there is proximity to the substance together with indicia of control, *Hill, supra.* Circumstantial evidence and reasonable inferences arising from the evidence are sufficient to establish possession. *Richardson, supra.*

The evidence presented at trial showed that defendant provided Officer Buczek with a sample of cocaine, participated in discussions regarding future sales, expressed interest in the denomination of the bills used to purchase the drugs, and told Officer Buczek that "we" do not like to keep the drugs and money in the room at the same time. When viewed in a light most favorable to the prosecution, there was sufficient evidence of both knowledge and indicia of control to enable the jury to find that defendant directly committed the crime of possession with intent to deliver 225 grams or more, but less than 650 grams, of cocaine.

We also find that the evidence was sufficient to convict defendant under an aiding and abetting theory. To aid and abet possession, there must be criminal intent and direct or indirect acts or encouragement that aid the perpetration of the crime. *People v Doemer,* 35 Mich App 149, 152; 192 NW2d 330 (1971). The act or encouragement must be done knowingly with the intent to aid the possessor in obtaining or retaining possession. *Id.*

In this case, although Stone was described as the "money man" and Wallace was the person who left to get the drugs, defendant was the one who met Officer Buczek at the door, told the informant that the drugs were in the bathroom when they were not, and told Officer Buczek that they did not like to have the drugs and money in the room at the same time. A jury properly could infer from this evidence that defendant was acting to protect the possession of the drugs by his confederates and that his actions aided and assisted in the commission of the crime.

Accordingly, because the evidence was sufficient to support a finding of guilt under either of the alternative theories, reversal is not required. *Acosta, supra* at 513.

Next, defendant argues that he was denied a fair trial because of instructional error. We disagree.

Although the trial court's instruction regarding reasonable doubt omitted the "moral certainty" language contained in former CJI 3:1:04 and CJI 3:1:05, the instruction was virtually identical to CJI2d 3.2(3), which no longer requires the "moral certainty" language. Read in its entirety, the instruction adequately presented the concept of reasonable doubt to the jury. See *People v Jackson,* 167 Mich App 388, 390-391; 421 NW2d 697 (1988).

Defendant also contends that instructional error occurred because the trial court failed to define the term "possession" for the jury. However, defendant did not request such an instruction at trial, and the absence of such an instruction did not result in manifest injustice. Therefore, this issue has not been preserved for appeal. *People v Kelly,* 423 Mich 261, 272; 378 NW2d 365 (1985). Further, we find that the failure to request an instruction defining possession did not constitute

ineffective assistance of counsel. *People v Tommolino,* 187 Mich App 14, 17; 466 NW2d 315 (1991).

Finally, the fact that defendant was not permitted to present his entrapment defense to the jury does not entitle him to reversal of his convictions. As noted previously, the issue of entrapment is decided in Michigan by the trial court in the jury's absence; a defendant is not then entitled to a "second bite at the apple" enabling the jury to second-guess the trial court's determination. *D'Angelo, supra* at 178.

IV

Next, defendant contends that the imposition of consecutive sentences for convictions of possession with intent to deliver cocaine and conspiracy to deliver the same cocaine violates the constitutional prohibitions against double jeopardy[6] and is contrary to the intent of the Legislature. Defendant further argues that his statutorily mandated twenty- to thirty-year prison terms constitute cruel and unusual punishment.

Among the protections afforded by the Fifth Amendment guarantee against double jeopardy is the protection against multiple punishment for the "same offense." *People v Sturgis,* 427 Mich 392, 398; 397 NW2d 783 (1986). This protection is designed to ensure that courts confine their sentences within the limits established by the Legislature. *Id.* at 399. While the term "same offense" applies to overlapping conduct that violates more than one statute, the scope of double jeopardy protection against imposed multiple punishment for the same offense is confined to a determination of legislative intent. *Id.* at 399-400.

In *People v Robideau,* 419 Mich 458, 487; 355

---

[6] US Const, Ams V, XIV; Const 1963, art 1, § 15.

NW2d 592 (1984), our Supreme Court identified some of the considerations relevant to a determination of legislative intent:

> Statutes prohibiting conduct that is violative of distinct social norms can generally be viewed as separate and amenable to permitting multiple punishments. A court must identify the type of harm the Legislature intended to prevent. . . .
>
> A further source of legislative intent can be found in the amount of punishment expressly authorized by the Legislature. Our criminal statutes often build upon one another. Where one statute incorporates most of the elements of a base statute and then increases the penalty as compared to the base statute, it is evidence that the Legislature did not intend punishment under both statutes.

While the controlled substance provisions of the Public Health Code are designed to protect society from the "patently harmful" effects of drug trafficking, see *People v Gorgon,* 121 Mich App 203, 206-207; 328 NW2d 619 (1982), the purpose of the conspiracy statute is to protect society from the "increased and special danger to society presented by group as opposed to individual activity." *People v Carter,* 415 Mich 558, 569-570; 330 NW2d 314 (1982). Thus, distinct social norms are involved. Further, the conspiracy statute, MCL 750.157a; MSA 28.354(1), provides for punishment equal to the substantive crime; it does not impose a hierarchical, harsher penalty based upon the presence of aggravating factors. Additionally, in *Carter, supra* at 569, our Supreme Court stated:

> It is a settled principle of black-letter law that conspiracy is a crime that is separate and distinct from the substantive crime that is its object. LaFave & Scott, Criminal Law, § 62, p 494; *People v*

*Tinskey,* 394 Mich 108; 228 NW2d 782 (1975); *People v Chambers,* 279 Mich 73; 271 NW 556 (1937). The guilt or innocence of a conspirator does not depend upon the accomplishment of the goals of the conspiracy. . . . Thus, a defendant may be convicted and punished for both the conspiracy and the substantive crime. *Pinkerton v United States,* 328 US 640; 66 S Ct 1180; 90 L Ed 1489 (1946).

In light of the foregoing, we conclude that separate convictions and punishment for possession with intent to deliver cocaine and conspiracy to deliver cocaine do not violate double jeopardy protections. See also *People v Velasquez,* 125 Mich App 1, 3-4; 335 NW2d 705 (1983).

We also disagree with defendant's claim that the Legislature did not intend for separate punishments to be imposed consecutively. The express language of MCL 333.7401(3); MSA 14.15(7401)(3), pursuant to which consecutive sentencing was ordered, provides that "[a] term of imprisonment imposed pursuant to subsection (2)(a) . . . shall be imposed to run consecutively with any term of imprisonment imposed for the commission of another felony." We reject defendant's contention that this statute is ambiguous. See *People v Mamon,* 190 Mich App 124; 475 NW2d 378 (1991). Rather, pursuant to the plain language of the statute, defendant's sentence for the separate and distinct felony offense of conspiracy was required to be consecutive.

Finally, defendant argues that the mandatory twenty- to thirty-year sentences required by MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii), in effect at the time defendant committed the instant offenses, constitute cruel and unusual punishment. While we reject defendant's cruel and unusual punishment argument, *People v Marji,* 180 Mich

App 525, 542-543; 447 NW2d 835 (1989), we never-theless vacate defendant's sentences, and in the event his convictions are affirmed on remand, we direct that he be resentenced under the amended sentencing provisions of the Public Health Code pursuant to *People v Schultz,* 435 Mich 517; 460 NW2d 505 (1990).[7]

v

In conclusion, we hold that defendant is entitled to a new entrapment hearing consistent with this opinion. We remand for this purpose. However, because defendant's jury convictions were properly obtained, these convictions shall be affirmed on remand if, after a new entrapment hearing, the trial court determines that defendant was not entrapped. In this event, defendant shall be resen-tenced in accordance with *Schultz, supra.* If, how-ever, a new entrapment hearing is not held, or if the trial court determines after a hearing that defendant was entrapped, his convictions shall be reversed and the charges dismissed.

Remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

---

[7] Judges Reilly and MacKenzie do not believe that *Schultz* consti-tutes binding precedent, inasmuch as only three members of the Supreme Court agreed on the basis for decision. *People v Anderson,* 389 Mich 155, 170; 205 NW2d 461 (1973). Further, they agree with the reasoning of the dissenters in *Schultz,* and thus, they do not believe that defendant is entitled to be resentenced pursuant to the amended version of § 7401. Nevertheless, Judges Reilly and MacKen-zie acknowledge that, since *Schultz* was decided, the Supreme Court, in lieu of granting leave to appeal, has repeatedly vacated rulings of this Court and remanded for resentencing in accordance with *Schultz.* See *People v Hamp,* 437 Mich 865; 462 NW2d 589 (1990), and other cases reported at 437 Mich 865-867. Accordingly, in the interests of fairness and judicial economy, Judges Reilly and MacKenzie reluc-tantly concur in the decision to grant resentencing in accordance with *Schultz.*