Filed 3/20/23 P. v. Lowe CA2/6

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DONALD JOSEPH LOWE,<br><br>    Defendant and Appellant. | 2d Crim. No. B311341<br>(Super. Ct. No. 18CR06466)<br>(Santa Barbara County) |

Donald Joseph Lowe appeals from the judgment after a jury convicted him of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)), possession of methamphetamine for sale (Health & Saf. Code, § 11378), and possession of heroin for sale (Health & Saf. Code, § 11351), and found true an allegation that he inflicted great bodily injury when he committed assault (§ 12022.7, subd. (a)). In a bifurcated proceeding, the trial court found true allegations that Lowe suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and two

_____

[1] Unlabeled statutory references are to the Penal Code.

prior serious felony convictions (§ 667, subd. (a)(1)) and that he served two prior prison terms (§ 667.5, subd. (b)).  It sentenced him to 25 years to life in state prison plus 18 years four months.

Lowe contends the judgment should be reversed because: (1) he was shackled during trial, (2) the prosecutor committed misconduct, (3) witnesses wore opaque masks while testifying, (4) the trial court misinstructed the jury, and (5) the errors, considered cumulatively, denied him due process.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

*The stabbing of J.M.*

In 2018, Lowe, J.M., and several others lived in a homeless encampment dubbed "Maravilla."  Lowe sold J.M. heroin and methamphetamine, sometimes at a reduced price.  J.M. occasionally ran short on cash and owed Lowe money.  The first time that happened Lowe did not get angry.  The second time he stabbed J.M.

On the day of the stabbing Lowe returned to Maravilla after being out of town.  He had previously told J.M. to move his belongings if law enforcement forced people from the camp.  Sheriff's deputies did so that day, so J.M. moved his and Lowe's belongings to "Manny's camp."  J.M. had only partially completed the move when Lowe returned to Maravilla.

Lowe was upset that his belongings were missing and confronted J.M.: " 'Where's all my stuff?  Where's my shit?' "  J.M. replied that deputies had evacuated Maravilla.  Lowe said, " 'No, fuck that.  Bring the stuff back.' "

J.M. gathered Lowe's belongings from Manny's camp, returned them to Maravilla, and left.  He then returned to Manny's camp and went to sleep.  Lowe arrived at the camp about an hour and a half later and asked where J.M. was.  He

was "not happy." J.G. woke J.M and told him that Lowe wanted to talk.

Lowe demanded $70 from J.M. J.M. gave Lowe $20 and said he would give him the rest later that night. He then walked away. Lowe came up behind J.M. and asked, " 'Are you fucking with my money?' " He then charged at J.M. J.M. blacked out.

When J.M. regained consciousness, he felt a sharp pain in his abdomen. He grabbed his side and felt "tubes sticking out." Lowe had a knife in his hand. J.M. yelled to J.G. and M.G., " 'This guy is stabbing me!' " He then got up and tried to run, but tripped and fell. Lowe grabbed him by the shoulder and said, " 'Why are you being such a pussy?' " He tried to lift J.M. but saw his intestines protruding and "freaked out." He told J.M., " 'Don't rat on me. Don't tell on me.' "

M.M. heard J.M. say that Lowe had stabbed him and called 911. She repeatedly told the operator that she did not know who stabbed J.M. She said that she believed J.M. knew the identity of his assailant, however.

Emergency personnel took J.M. to the hospital, where he underwent emergency surgery. The next day M.M. called the sheriff's department and reported that Lowe had stabbed J.M.

J.M. spent two days in a medically induced coma. He refused to tell police who stabbed him when he awoke. When he saw his mother, however, he identified Lowe as his attacker.

J.M. left Santa Barbara after his release from the hospital. Shortly thereafter, R.C. contacted J.M. on Lowe's behalf. R.C. asked J.M. what his "story was going to be to the detectives" and pressured him to say that it was an accident. At first J.M. complied. He later told detectives that he was sleeping when he was stabbed and could not identify his attacker.

Police arrested Lowe for the assault on J.M. in July 2018. When he was arrested he had methamphetamine, heroin, and a folding knife in his pockets. Another knife was found nearby.

Lowe made several calls from jail. In one call he said that he was walking behind J.M. when he tripped over an unknown object and cut J.M. as he fell. In none of the calls did he say that J.M. lunged at him or tried to rob him prior to the stabbing.

*Pretrial orders*

In August 2020, the Santa Barbara County Counsel moved to have Lowe restrained with leg shackles during trial. County Counsel argued that Lowe exhibited "disrespect for officers" and "fail[ed] to disengage during a fight after the instructions to do so." He had shown a "pattern of disrespect, violence, and unruliness" and had to be pulled from an inmate during a jailhouse fight. He gave another inmate methamphetamine, and nearly overdosed on the substance himself. The incidents detailed in County Counsel's motion occurred between 2016 and 2020.

Prosecutors augmented County Counsel's argument by noting that Lowe had threatened to "cut the throat" of his cellmate in January 2020. In a subsequent phone call, Lowe said the conflict was building up to a " 'crescendo' " and that " 'shit's going to fly.' " In another call he again complained about his cellmate: " 'I'm about to have a big ol' fight with my [cellmate], man. I'm tired of his fucking punk ass.' "

Lowe countered that leg shackles would be noticeable to the jurors. He said he did not follow the order to stop fighting because he was defending himself. The other bases for shackling him were "very old." He no longer posed a threat because he was physically weak.

4

The trial court granted the shackling motion. Lowe exhibited "aggressive behavior" toward deputies multiple times since his arrest. He made an obscene gesture to a deputy, and advanced to the jail cell door after a deputy told him to "back off." He twice fought other inmates, acting as the aggressor in each instance.

The trial court ordered Lowe to be shackled with black leg cuffs and seated at a table with a black table skirt. All parties, including counsel, were to remain seated during trial so Lowe would not be the only one sitting. The sheriff's department was to "reduce any clanking noises" caused by the shackles. And while the trial judge sat in the juror's seats to confirm Lowe's restraints would not be seen by the jury, the parties were to notify the court if the shackles became visible at any point during trial.

The trial court also ordered all participants to wear a mask covering their nose and chin during trial. Clear masks were permitted but would not be supplied by the court. The use of a clear face shield alone was not allowed.

*Trial*

J.G. testified at Lowe's trial. He said that he was at Manny's camp the night Lowe stabbed J.M. He, M.G., and M.M. were watching videos on a phone when Lowe showed up at the camp looking for J.M. J.G. heard J.M. and Lowe talking and then heard a scream. He left the camp, believing that J.M. could fend for himself in a fight. He did not think the encounter would turn deadly.

Prosecutors introduced several text messages sent from Lowe's cell phones at trial. In one of the messages Lowe told M.G. that his belongings had been stolen and that he was looking

for J.M.  He said that he would stab anyone in possession of his missing belongings.  In another message Lowe told R.C. that his camp had been " 'robbed' " and that if he found out who stole his belongings he would " 'hurt them bad.' "  In a third message Lowe told N.C. that his " 'tent got ransacked' " and that he was going to " 'hunt down who did it and kill them.' "  In a fourth Lowe told R.C., " 'I'm in big trouble.  Possible [r]est of my life in prison trouble.  I sort of accidentally stabbed a guy.  His guts were spilling out and it was pretty bad.' "

Lowe sent additional messages in the days after the stabbing.  In a message to B.W., Lowe said that J.M. was willing to say the stabbing was accidental.  In another message he said that he " 'screwed up' " and " 'sort of stabbed a guy.' "

Lowe testified in his own defense.  He said that he and J.M. had both stayed at Maravilla for about two months prior to the stabbing.  He was a drug dealer there and "threatened people all the time."  He sought to alienate people and make them fear him.

On the morning of the stabbing, Lowe went to Bakersfield, leaving his belongings at Maravilla.  When he returned he saw that half of his belongings were missing from his tent.  He believed someone had stolen them and sent threatening text messages to several people.  He was "livid" for "a good hour."

Lowe said he confronted J.M.  J.M. explained that he had moved Lowe's belongings.  Lowe was relieved, but also irritated.  He called J.M. an idiot and told him to return the items to Maravilla.

Lowe later returned to Manny's camp.  While he and J.M. were talking, Lowe hit his shin on something and fell to the ground.  He got up and yelled at J.M.  J.M. then lunged at Lowe and grabbed his hand.  The two fell to the ground.  After Lowe

6

got up, J.M. screamed that something was wrong with his stomach. Lowe looked down and saw J.M.'s intestines protruding from his abdomen. He had accidentally stabbed J.M.

Lowe saw M.M. nearby and told her to call 911. He thought J.M. might die. He then left the camp because he did not want to be caught with heroin and methamphetamine.

Lowe did not tell police that J.M. grabbed his hand and tried to steal his drugs because that would make him a "rat." Lowe admitted, however, that a few months before the stabbing he provided information to law enforcement in exchange for a more lenient sentence in a drug possession case. He also offered to testify against drug dealers in other cases in exchange for leniency in this case.

Lowe acknowledged that he made many phone calls from jail, including some to R.C. In one of those calls, Lowe said that he was holding a knife and accidentally cut J.M. when he tripped. In another call, Lowe said that M.M. and others were rats because they spoke to law enforcement after the stabbing.

On cross-examination, the prosecutor challenged Lowe on his views about cooperating with law enforcement. He asked, "You were talking about being a rat. Yes?" Lowe said, "Yes, sir." Lowe also admitted that he was "under contract as a rat" in a murder case when he assaulted J.M. The prosecutor then asked Lowe about letters he wrote "asking for a deal in exchange for . . . ratting on at least eight different people in jail." Lowe admitted that he wrote such letters. The prosecutor continued: "And you were going to plead guilty to all charges for this[?]" Lowe said that he had agreed to do so.

During redirect examination, Lowe said that he offered prosecutors information on the perpetrators of multiple crimes.

7

He also said that in 2018 he contacted a prosecutor in a cold-case murder investigation and provided information in exchange for being released into a drug treatment program. Lowe explained that he sought to use his status as a rat to cut himself off from his drug sources. He feared that if he told authorities that J.M. had tried to rob him, J.M. would retaliate and not testify that the stabbing was an accident.

*Motion for mistrial*

During a break in testimony, Lowe moved for a mistrial based on prosecutorial misconduct. Lowe argued that the prosecutor violated Evidence Code section 1153 by questioning him about statements made in plea negotiations. The prosecutor replied that Lowe had opened the door to the questions by accusing M.M. and others of being rats. The trial court denied Lowe's mistrial motion.

Lowe later renewed his motion. In response, the prosecutor argued the letters were properly used for impeachment. The trial court agreed and again denied the motion.

*Jury instructions*

During the discussion of jury instructions, the prosecutor requested that the trial court instruct jurors pursuant to CALCRIM No. 362, regarding consciousness of guilt and false statements. The trial court gave the instruction:

> "If [Lowe] made a false or misleading statement before this trial relating to the charged crimes, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crimes and you may consider it in determining his guilt.

8

"If you conclude that [Lowe] made the statement, it is up to you to decide its meaning and importance. However, evidence that [Lowe] made such a statement cannot prove guilt by itself."

Lowe did not object. He said, "I think it's sua sponte, or close enough."

*New trial motion*

After jurors convicted him, Lowe moved for a new trial based on his shackling at trial, the masking of trial participants, and the alleged prosecutorial misconduct surrounding the questions about rats. The trial court denied the motion. As to the shackles, the court noted that the "sheriff's department went to great lengths to hide [them]," and the courtroom deputy ensured that Lowe was moved only when jurors were outside the courtroom. There was also "no evidence that the jurors ever saw . . . [the] shackles."

As to the face masks, the court concluded that their use did not violate Lowe's constitutional right to confrontation.

Finally, as to the questions about the letters Lowe sent, the court explained that using the letters for impeachment did not violate Evidence Code section 1153's bar to admission of offers to plead guilty.

DISCUSSION

*Shackling*

Lowe first contends the trial court erred when it ordered him to be shackled at trial. We disagree.

Lowe points to no evidence in the record showing that any member of the jury was aware that he was wearing shackles. Courts "have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by

9

the jury." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584.) This is because "[t]he potential effect on the presumption of innocence is eliminated if the jury does not see the shackles." (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1829.) "[M]easures such as . . . unobtrusive leg [shackles] concealed under . . . a draped counsel table [that] prevent the jury from seeing that the defendant is restrained at all"—the scenario during Lowe's trial—thus render harmless any erroneous, unjustified shackling. (*Ibid.*)

The shackles here were nevertheless justified. A " 'trial court has broad power to maintain courtroom security and orderly proceedings.' " (*People v. Stevens* (2009) 47 Cal.4th 625, 632.) But "extraordinary security practices" like leg shackles "carry an inordinate risk of infringing [on] a criminal defendant's right to a fair trial" because they "may erode the presumption of innocence." (*Ibid.*) Such "exceptional practices must be justified by a particularized showing of manifest need sufficient to overcome the substantial risk of prejudice they pose." (*Ibid.*)

A "manifest need can be made with ' "evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court." ' " (*People v. Young* (2019) 7 Cal.5th 905, 934 (*Young*).) While a trial court's finding that such a manifest need exists " ' "cannot be based on rumor or innuendo[,] . . . a formal evidentiary hearing is not required." ' " (*Ibid.*) We review for abuse of discretion. (*Ibid.*)

The trial court did not abuse its discretion when it found that such a manifest need existed here. Lowe was aggressive toward sheriff's deputies. He threatened them and refused to follow orders. He sold and used drugs in jail. He engaged in

10

jailhouse fights, had to be pulled off a fellow inmate, and threatened to kill his cellmate. Such conduct supports the trial court's decision to order Lowe's shackling during trial. (See, e.g., *Young*, *supra*, 7 Cal.5th at pp. 934-935 [use of leg restraints appropriate where defendant had "numerous problems while in custody"]; *People v. Amezcua & Flores* (2019) 6 Cal.5th 886, 910 [manifest need for shackles shown where defendant had multiple "incidents of violent or nonconforming custodial behavior"].)

*Prosecutorial misconduct*

Lowe next contends the prosecutor committed misconduct by referring to improper impeachment evidence—the letters he wrote offering to provide information against other defendants—during cross-examination. But Lowe did not timely object to the prosecutor's questions. His contention is forfeited. (*People v. Loker* (2008) 44 Cal.4th 691, 737.)

It is also meritless. " 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct.' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.) Examples of such methods include " 'intentionally elicit[ing] inadmissible testimony' " (*People v. Bonin* (1988) 46 Cal.3d 659, 689, overruled on another point by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1), asking questions that " 'call[] for inadmissible and prejudicial answers' " (*People v. Bell* (1989) 49 Cal.3d 502, 532), and "mak[ing] improper references to extrinsic matters" (*People v. Kelley* (1977) 75 Cal.App.3d 672, 689). These " 'actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " ' " (*Friend*, at p. 29.) " 'Under state law, a prosecutor who uses such methods

11

commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*Ibid.*)

There was no misconduct here. Evidence of a defendant's offer to plead guilty to a crime is generally inadmissible at trial. (Evid. Code, § 1153.) Prosecutors may, however, use such evidence to impeach the defendant. (*People v. Crow* (1994) 28 Cal.App.4th 440, 452.)

Here, on direct examination Lowe testified that he stabbed J.M. after J.M. grabbed him and tried to steal drugs. He testified that he previously said the stabbing was an accident because he did not want to be labeled a rat for reporting J.M.'s attempted robbery. He also testified that he considered M.M. and others who spoke to law enforcement about the stabbing to be rats. Such testimony opened the door to the prosecutor's questions about why Lowe did not want to be known as a rat in this case but, as detailed in the letters, had offered to be one in others.

Lowe counters that the prosecutor's question about his willingness to " 'plead guilty to all charges' " in this case "went beyond merely impeaching [his] testimony regarding his fear of being labeled a rat" and instead "inform[ed] the jury that [he] had agreed to admit guilt." But the question must be considered in context. (*People v. Tully* (2012) 54 Cal.4th 952, 1016.) The question was part of a series of inquiries aimed at probing the depth of Lowe's commitment, if any, to not being labeled a rat. It was not used to urge the jury to convict Lowe of the charged crimes. As such, there was no violation of Evidence Code section 1153, and no prosecutorial misconduct.

*Masks*

Next, Lowe contends the trial court violated his constitutional right to confrontation by not requiring witnesses to

12

wear clear face masks while testifying. Lowe is mistaken. "It does not violate the confrontation clause for a judge to order trial witnesses to wear [opaque] masks during the [COVID-19] pandemic." (*People v. Edwards* (2022) 76 Cal.App.5th 523, 525 (*Edwards*).)

The confrontation clause of the Sixth Amendment to the United States Constitution provides a criminal defendant the right to " 'physically . . . face those who testify against [them].' " (*Coy v. Iowa* (1988) 487 U.S. 1012, 1017.) But this right is not absolute. (See *Maryland v. Craig* (1990) 497 U.S. 836, 847 (*Craig*).) While " 'the [c]onfrontation [c]lause reflects a *preference* for face-to-face confrontation at trial,' " that preference " 'must occasionally give way to considerations of public policy and the necessities of the case.' " (*Id.* at p. 849.) Accordingly, face-to-face confrontation may be dispensed with if: (1) the "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." (*Id.* at p. 850.) Whether these requirements were met here is a question for our independent review. (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 36 (*Alvarez*).)

They were. First, "there is no doubt that requiring people to wear masks covering the mouth and the lower part of the nose while testifying in the courtroom during the COVID-19 pandemic served an important state interest in protecting the public from a contagious, and too often, lethal, disease." (*Alvarez, supra,* 75 Cal.App.5th at p. 36; see also *People v. Lopez* (2022) 75 Cal.App.5th 227, 234 (*Lopez*).)

Second, reliability of the testimony of the witnesses at Lowe's trial was otherwise assured. Testimony may be deemed

13

reliable if: (1) it was given in person and (2) under oath, (3) it was subject to cross-examination, and (4) the defendant and jury had the opportunity to "view witness demeanor for the purpose of evaluating credibility." (*Alvarez, supra*, 75 Cal.App.5th at p. 37.) Here, there is no question that the first three of these elements were met: Witnesses testified in person and under oath, and were subject to cross-examination. And as to the fourth, "[a]lthough face masks covered the witnesses' mouths and the lower part of their noses, significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable." (*Id.* at p. 38.) So, too, was their "posture, tone of voice, cadence[,] and numerous other aspects of demeanor." (*Ibid.*) There were also additional "factors relevant to the jury's assessment of witness credibility, none of which was impacted or diminished by the" requirement that witnesses wear masks: "(1) how well the witness could see, hear, or otherwise perceive the things about which [they] testified, (2) how well the witness was able to remember and describe what happened, (3) whether the witness answered questions directly, (4) whether the witness's testimony may have been influenced by bias or prejudice in the form of a personal relationship with someone involved in the case, or a personal interest in how the case was decided, (5) any past consistent or inconsistent statements by the witness, (6) the existence of other evidence that proved or disproved any fact about which the witness testified, and (7) whether the witness admitted to being untruthful about any aspect of his or her testimony." (*Lopez, supra*, 75 Cal.App.5th at p. 235.) These factors gave the jury ample ability to assess the credibility of witnesses.

14

Citing nonbinding federal district court decisions—the bulk of which are unpublished—Lowe counters that the jury would have been able to assess credibility better had the trial court required witnesses to wear clear masks while testifying. But he cites no evidence that such masks would have been effective in combatting the spread of COVID-19. (*Edwards*, *supra*, 76 Cal.App.5th at p. 527.) And even if they were, the court was not required to "explore less restrictive alternatives" when restricting his confrontation rights. (*Craig*, *supra*, 497 U.S. at p. 860.) The court below nevertheless did, and said that it would permit witnesses to wear clear masks while testifying. Were Lowe really concerned with having witnesses wear such masks he was free to provide them.

Lowe also cites pre-pandemic, out-of-state cases to show the erroneous deprivation of his confrontation rights. These cases are easily distinguished. In *Romero v. State* (Tex.Crim.App. 2005) 173 S.W.3d 502, 503-506, the court found a confrontation clause violation because the witness wore "dark sunglasses, a baseball cap pulled down over his forehead, and a long-sleeved jacket with its collar turned up and fastened so as to obscure [his] mouth, jaw, and the lower half of his nose." The court in *People v. Sammons* (Mich.App. 1991) 478 N.W.2d 901, 907-909, found a confrontation clause violation where the witness wore a full-face mask. Here, in contrast, witnesses wore masks that did not obscure their entire faces. There was no confrontation clause violation.

### *CALCRIM No. 362*

Lowe next contends the trial court erred when it instructed jurors on false statements and consciousness of guilt. (See CALCRIM No. 362.) But Lowe failed to object to the instruction

15

at trial.  Indeed, he *admitted* that the evidence presented at trial supported the instruction.  He has thus waived his contention. (*People v. Bolin* (1998) 18 Cal.4th 297, 326.)  And we would reject it even if he hadn't.

A trial court properly instructs the jury with CALCRIM No. 362 when the instruction is supported by the evidence at trial. (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103-1104; see also *People v. Kelly* (1992) 1 Cal.4th 495, 531-532 [upholding use of predecessor instruction].)  Here, substantial evidence supported the use of the instruction.  On the night of the stabbing Lowe begged J.M. not to tell people he had stabbed him.  Later, through R.C., Lowe pressured J.M. to lie and say the stabbing was an accident.  In jailhouse phone calls he again said the stabbing was an accident, only to revise his version of events at trial and say that he stabbed J.M. in self-defense during an attempted robbery.  In some text messages Lowe said that he accidentally stabbed J.M., but in others he said that he feared a long prison sentence.  Lowe tried to explain these inconsistencies at trial by claiming that he did not want to be known as a rat, but he then admitted that he had acted as a rat in other cases.  Such inconsistencies support the trial court's decision to instruct the jury pursuant to CALCRIM No. 362. (*People v. Kimble* (1988) 44 Cal.3d 480, 498.)

Lowe counters that the trial court had to determine that the stabbing was not accidental to conclude that the use of CALCRIM No. 362 was proper.  We disagree.  CALCRIM No. 362 is properly given when supported by the evidence, and leaves it to the jury, not the trial court, to determine whether a defendant made false or misleading statements. (*People v. Roder* (1983) 33

16

Cal.3d 491, 506.)  The instruction is not logically circular.  (*People v. Bacon* (2010) 50 Cal.4th 1082, 1108.)

*Cumulative prejudice*

Finally, Lowe claims the prejudicial effect of the errors at trial, considered cumulatively, denied him a fair trial.  But we have rejected all of Lowe's individual claims of error.  His cumulative prejudice claim thus necessarily fails. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1094.) DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


BALTODANO, J.


We concur:



GILBERT, P. J.



YEGAN, J.

Von Deroian, Judge

Superior Court County of Santa Barbara

_____

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.