# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
April 19, 2016

v

ALI MOHAMED ELATRACHE,

Defendant-Appellant.

No. 324918
Wayne Circuit Court
LC No. 14-000096-01-FC

Before: BECKERING , P.J., and OWENS and K. F. KELLY, JJ.

PER CURIAM.

The prosecution alleged that defendant harassed his girlfriend, whom we will refer to as "S," and ultimately killed her father, Mohammed Aljbaili (the victim). Defendant was originally charged with first-degree premeditated murder, MCL 750.316(1)(a), first-degree felony murder, MCL 750.316(1)(b), first-degree home invasion, MCL 750.110a(2)(b), and aggravated stalking, MCL 750.411i(2)(c). Defendant pleaded guilty to the stalking charge just prior to trial. A jury found defendant guilty of second-degree murder, MCL 750.317, as a lesser offense of premeditated murder, guilty of felony murder, and not guilty of home invasion. The court sentenced defendant to three to five years' imprisonment for his stalking conviction and life in prison without the possibility of parole for the felony murder conviction. The trial court vacated defendant's second-degree murder conviction. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS

S and the 72-year-old victim lived together in an apartment. The victim had heart problems, having had bypass and quadruple bypass surgery. He was a retired international lawyer and spent a lot of his time reading articles. Syrian born, the victim was a human rights activist and wrote articles and sometimes appeared on television, advocating that the Syrian people be free.

S testified that she met defendant when he came to the Verizon store where she worked in late February 2013. Defendant seemed normal, nice and friendly and they started dating that month. Defendant told her that his wife and child were killed in a war. He also talked about his ex-girlfriend, Marwa, all the time. He told S that Marwa had cheated on him and "screwed him over."

Within two or three weeks of their relationship, defendant began to change. He would get very jealous of little things. Defendant would question S about her past and ask her about her coworkers. He would randomly show up at her work. Defendant would circle the parking lot all of the time and his

behavior caused problems for S. at work. There were at least three separate instances when defendant took S's cell phone and only returned it after she begged. Within a month of their relationship, S knew she needed a "break" and defendant's behavior caused her concern, but defendant would make her feel sorry for him, reminding her that he had lost his wife and child and that his old girlfriend treated him badly. She was also afraid of him because he had pulled her hair and twisted her arm. S stayed with defendant because she was scared but she also thought she could "handle" him.

Defendant once came to S's work and asked for her keys because he had run out of gas and needed to run some errands. S was suspicious and did not want to give defendant her keys, but he was starting to cause a scene so she handed them over. The keys included her apartment key. Defendant returned her keys after an hour. After this, there were a number of events at S's apartment that caused her concern.

On March 27, 2013, S came home and found that her laptop was missing, along with a couple of phones. S called defendant to let him know what happened, but she did not call police. Defendant told S that he received a phone call from someone who said "I have the girl's phones. I have her stuff." S felt that defendant was somehow involved but he acted as though he was trying to help. S continued to date defendant even though she was scared and confused. She ultimately received her laptop and three cell phones back.

On April 3, 2013, S's father awoke to discover that his laptop was missing. This time S called the police. S also told police about the prior break in and named her ex-boyfriend, Ali Makki, as a possible suspect. Defendant was the one that suggested it was Makki. S no longer suspected defendant because she thought he was trying to help. The apartment management changed the apartment locks.

After the second break-in, S came home one day to see defendant in the apartment with her father. Defendant was telling her father that he believed "something else was going on" and that "there were people after my dad." Defendant indicated that he would protect them.

Another incident occurred on April 19, 2013 when S woke up to find the front door to their apartment on fire. She doused the fire with water. Once again, S and her father told the police that there were people after her father. They did not suspect defendant because he was working on getting her father's laptop returned and she believed that there were people after her father because of his politics. At one point, defendant actually went to Lebanon in April 2013 and told her it was to fight the people who were after her father. Defendant returned with her father's laptop.

S was not certain of exactly when, but at some point she began to hear a voice when she was speaking to defendant on the phone. During their conversation, a voice would come in and say, "'I'm going to kill you. I'm going to kill your dad. I'm going to burn you. I'm going to burn your house.'" S was afraid that maybe someone was tapping her phone. She began to record the conversations to see whether someone was trying to get her father. S told defendant about the voice. Defendant said he could hear clicking, but that he did not hear the voice. Again, defendant promised to protect S and her father. S never heard the voice when she was on the phone with anyone else other than defendant. Defendant told S to not let her father go on the internet. He also advised her not to contact police again because the individuals who were after her father would find out. She never reported the phone calls to police. S admitted that her fear of defendant had "morphed" into dependency.

S's car was also vandalized in April 2013 when someone put chemicals in the gas tank. Defendant told her that he would handle it. Upon returning from the mechanic, S and her father discovered that their apartment had been broken into. This time there was obvious forced entry because the door was damaged. Her father's briefcase was stolen and there were some items missing. S called the police. Once again, S told police she suspected someone was after her father. Management later fixed or replaced the door.

At that time, S became suspicious of defendant because he was the only person who knew she and her father were going to be at the mechanic's. She decided to contact defendant's brother, Mazen Elatrache (Mazen), because she did not know what else to do. Defendant's family came to her apartment and asked her not to go to the police. They also brought someone who was allegedly from the FBI. S testified that "They said they will take care of it. They begged me not to go to the police." The family promised to send defendant to Lebanon.

After all of the break-ins, S discovered that a Chase debit card was missing. It was a replacement card that she had received in the mail but had not activated. She only learned it was missing when she called the bank to see why she had not received a replacement card. S discovered that "the whole account was wiped clean" of approximately $2,000. Some of the charges were from Frankfurt, Germany, Beirut, Lebanon, and London, England. The charges were from late April/mid May 2013. S knew defendant had been in Lebanon and accused him, but he initially denied it. He later said he found the card on his doorstep and apologized.

Defendant called her from an airplane and admitted to everything. S recorded the conversation. In the phone call, defendant admitted, "I did everything . . . Ali Makki never did anything to you. . . . In one phone call you'll see your father die in front of your eyes. . . .You know what's going to happen to you and your father later." In a separate recording, defendant told S he can see her from where he was standing. He said, "I'm going to kill your dad. When this time comes, I'm going to kill him . . .If you hang up your phone, you will see what will happen to your dad . . .He is a traitor. He has no pride, and I'm the one who called him from Lebanon. . . .In one phone call I will have your dad dead." In another recording, he said, "Do you know what I'm going to do to your dad? . . .Maybe I will do something now. Maybe I'll do something in a year."

Defendant was suddenly back in the States in May 2013. S started to keep track of text messages. She began to receive text messages in May 2013 from a different number. The texts were "creepy," with messages like "turn off your bedroom light." S suspected defendant because no one else talked to her that way.

S felt terrorized from May to June 2013 with defendant telling her she had to cooperate with his family and not go to police. Nevertheless, she continued to have contact with defendant. She explained that she "kept things nice with him to calm him down, and I did what he wanted, and then we didn't have any issue. As long as I was nice to him, everything was fine." She was trying to find a way to slowly pull away from defendant. By June 2013 she was "in complete misery." By the end of the month, defendant was "like a maniac again."

S discussed text messages from defendant in July 2013:

"You're a f***ing slut. F*** off and go watch yourself."

"Watch yourself or leave Michigan."

"Filthy c*** sucker slut, whore, sharmoota [slut]."

[S] should go "shoot yourself, slut, and watch yourself and leave Michigan. You're going to become famous today."

"You were out. Your car moved."

On July 12, 2013 defendant texted:

"You played the wrong guy. You will see."

"Welcome to hell. Now f*** off."

On July 13, 2013:

"You made me fucking hate you. I hope God punishes you."

"Just prepare. I really mean it."

"Run, run, you barely have time."

Texts from July 14th to July17th, 2013 indicate that defendant got even more aggressive. Ironically, S writes: "My dad is ill. You will give him a heart attack." Defendant texted:

"Take my word. I'll take your soul."

"You can make me be an angel or a devil."

"I will put a bullet in your head or choke you or chop it off. You choose. And if you put a thousand police officers in front of your door, I will do that."

"Keep making me upset and angry." "I'm not going to let you go [S] . . . Until I'm dead."

On July 17, 2013, she got a message "I talked to your dad. I sat with him." S told defendant she did not want them to be enemies and begged him to think about his future. He responded that she was "worse than Marwa." S saw her father that day and he was fine, although confused about defendant's visit. S admonished her father not to open the door for defendant in the future and he agreed. S did not believe that her father would voluntarily open the door to defendant.

S once again called Mazen on July 18, 2013 and told him that she needed his help. Defendant sent her a text, "why the f*** are you calling my brother. Leave me and my family alone. I don't want anything from you." When S returned home from work that evening, she found the door to their apartment open. That was unusual because her father generally kept the door closed and locked. She found her father dead on the floor of his bedroom.

After the murder, S looked at her father's phone and found threats defendant sent directly to her father:

"And the laptop I took it to Syria, and I'll make sure you die. Don't worry. Just wait."

"I have copies of your driver's license, your passport, your birth certificate, and wherever you go, I will find you."

"[A] f***ing traitor like you needs to be dead."

Defendant was apprehended in Canada after he tried calling S.

S's downstairs neighbor, Sallam Baker testified that when she came home from work at 6:30 p.m. that night, she observed two men in a red Blazer that was not usually in the complex's parking lot. She thought that they might have been Middle Eastern or Hispanic. Upon entering the unit, Baker observed that the upstairs apartment door was open. She could hear "loud voices upstairs," but could not make out what was being said. The voices seemed to be coming from the kitchen and living room area. Baker later revised her testimony and indicated that, in fact, she heard only one voice. Baker believed the victim was on the phone with someone. It was not unusual to hear the victim "being loud" so Baker just ignored it. Baker then heard "sort of like things falling over, like a loud bang and like something tipping over." Baker debated about going upstairs to see if all was well, but decided not to. She then heard "a scream, a muffled, it sounded very muffled like he was screaming into a pillow, that muffled sound."

Officers observed pry marks and missing pieces of wood on the front door when they responded to the murder scene. The apartment appeared to be in some disarray and S's room was ransacked. One officer could smell pepper spray or mace upon entering the apartment. The victim was lying on the floor on his back. There was dried blood on his mouth and visible bruising on his face. There was a belt resting on his neck, but not around it. The pillows and sheets on the bed had blood on them, as well as the base of the door by the dresser. There was a medallion next to the victim's body. A can of mace was found under a chair in the living room. No finger prints of comparison value were lifted from the mace spray can or the medallion. Hair on the chain of the medallion was never tested. DNA on the mace dispenser swab was too limited for a DNA comparison. There were two donors on the leather belt – and the major donor was the victim and defendant was excluded as a donor. For the blood on the bedroom door knob – neither the victim nor defendant could be excluded. There was no foreign DNA in the victim's fingernail clippings. Defendant's DNA was excluded from the medallion.

Deputy Chief Medical Examiner for Wayne County Leigh Hlavaty testified that the manner of death was homicide and the cause of death was manual strangulation. Defendant offered his own experts who testified that it was not strangulation that killed the victim, but the victim's bad heart.

At the close of proofs, the trial court declined to instruct the jury on the lesser included offenses of voluntary and involuntary manslaughter. The jury was instructed on first-degree premeditated murder, first-degree felony murder, second-degree murder, and first-degree home invasion. The jury found defendant guilty of second-degree murder as a lesser offense of first-degree premeditated murder. It further found defendant guilty of first-degree felony murder. It found defendant not guilty of first-degree home invasion. Defendant was sentenced to three to five years' imprisonment for his stalking conviction that was the result of a prior plea and life in prison without the possibility of parole for the felony murder conviction. Defendant now appeals as of right.

II. ANALYSIS

## A. JURY INSTRUCTIONS

Defendant argues that the trial court erred in failing to instruct the jury on voluntary and involuntary manslaughter where the evidence revealed that the victim suffered from a bad heart. We disagree.

"[J]ury instructions that involve questions of law are [] reviewed de novo. But a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (internal quotation marks and citation omitted).

"Challenges to jury instructions are considered in their entirety to determine whether the trial court committed error requiring reversal." *People v Eisen*, 296 Mich App 326, 330; 820 NW2d 229 (2012). "Jury instructions must clearly present the case and the applicable law to the jury. The instructions must include all elements of the charged offenses and any material issues, defenses, and theories *if supported by the evidence*." *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005) (emphasis added, internal citation omitted). Therefore, "when a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge. *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909, modified on other grounds 450 Mich 1212 (1995). However, a trial court is not required to give a requested instruction "where the theory is not supported by evidence." *Id.* In the event of an instructional error, a defendant must "demonstrate that it is more probable than not that the failure to give the requested lesser included misdemeanor instruction undermined reliability in the verdict." *People v Cornell*, 466 Mich 335, 364; 646 NW2d 127 (2002).

At the close of proofs, defense counsel asked the trial court to instruct on the lesser included offenses of second-degree murder, as well as voluntary and involuntary manslaughter.

> [T]he elements of voluntary and involuntary manslaughter are included in the elements of murder. Thus, both forms of manslaughter are necessarily included lesser offenses of murder. Because voluntary and involuntary manslaughter are necessarily included lesser offenses, they are also "inferior" offenses within the scope of MCL § 768.32. Consequently, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence. [*People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003).]

### 1. VOLUNTARY MANSLAUGHTER

In requesting a voluntary manslaughter instruction, defense counsel argued:

> For voluntary manslaughter we know that some type of altercation occurred from two sources, one being from Sallam Baker [the downstairs neighbor], which it may be not entirely conclusive, and the other from the crime scene photographs.

> If there was an altercation – we also know that there was some pre-existing possible ill feelings between the deceased and the defendant that could lead a rational jury to come to the conclusion that a fight ensued.

However, when pressed by the court as to what would cause an "emotional disturbance," defense counsel responded: "Your Honor, I don't have further argument on that. So I would rather turn to involuntary manslaughter." When the matter continued, co-counsel renewed the request for both voluntary and involuntary manslaughter. However, while counsel argued why involuntary manslaughter was appropriate, she did not argue voluntary manslaughter.

The trial court declined to give a voluntary manslaughter instruction, explaining:

> With regards to the voluntary manslaughter instruction, that does require that there be an adequate and reasonable provocation that mitigates murder down to the crime of manslaughter.
>
> And ordinarily that is a question of fact with regards to the jury's determination as to whether or not it has been sufficiently mitigating conduct that reduces it from murder to manslaughter.
>
> \*\*\*
>
> But the Michigan Supreme Court has also stated that the provocation has to be adequate and one that would cause a reasonable person to lose control.
>
> \*\*\*
>
> [T]he provocation has to be one that would cause a reasonable person to lose control. And there is no evidence in this case introduced to show what kind of provocation there might have been. That there was an argument. There may have been an argument.
>
> Looking at that in the light most favorable to the defense, there is nothing to indicate what that argument was about, whether it was about something serious, whether it was about something trivial. There is no evidence to indicate that, and there is nothing that would appear on this record that would indicate that an objective, reasonable person would conclude that there was a basis to lose control, that there's a reasonable basis for doing so.
>
> So I find that there is insufficient evidence to justify an instruction for voluntary manslaughter.

The trial court properly declined to give a voluntary manslaughter instruction given the facts of this case.

> [T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions. Significantly, provocation is not an element of voluntary manslaughter. Rather, provocation is the circumstance that negates the presence of malice. [*People v Reese*, 491 Mich 127, 143-44; 815 NW2d 85 (2012), quoting *Mendoza*, 468 Mich at 535-536.]

Therefore, to support a jury instruction for voluntary manslaughter, the evidence must show that defendant killed in the heat of passion caused by adequate provocation and there was not a lapse of time during which a reasonable person could control his passions. There was no evidence to support defendant's contention that he was adequately provoked such that malice was negated. Additionally, based on the victim's numerous injuries, it appears that there was a lengthy struggle during which time defendant could have re-examined and controlled his passions. Although defendant argues at great length that the cause of death was not strangulation but a heart attack, the fact of the matter is that each of the three medical examiners who testified at trial categorized the victim's death as a homicide, even though they may have disagreed as to the actual mechanism of death.[1] Defendant did not kill the victim in the heat of passion after adequate provocation. That defense counsel had difficulty mustering up an argument to support giving such an instruction in the trial court buttresses the trial court's decision.

## 2. INVOLUNTARY MANSLAUGHTER

The trial court summarized defense counsel's argument regarding involuntary manslaughter:

> [I]s your theory of involuntary manslaughter essentially that it's what we would maybe euphemistically refer to as the misdemeanor manslaughter kind of rule, where there is something that would be described as a simple assault that results in a death, where the assault in and of itself was not deemed to be deadly, but it results in a death, that that's considered manslaughter?

> Kind of like the notion of somebody getting in an argument in a bar and punches somebody in the nose, and they fall over backward and hit their head on the edge of a table and die as a result of that.

Counsel indicated that it was a "fair categorization" of his argument. The trial court declined to give an involuntary manslaughter instruction, explaining:

> We have a situation where looking at the other injuries to the victim, Mr. Aljbaili, certainly there are multiple injuries to the head, including a laceration to the top of the head.

> There are abrasions and bruises, multiple bruises to the face, and certainly injuries to the throat or neck muscles that are consistent with an attempt to strangle the deceased.

> The injuries, particularly the laceration to the top of the head, there is testimony from multiple doctors in this case, that the injuries, particularly the laceration to the top of the head, was consistent with a blunt force and the other injuries reflect more than the type of one strike incident that we see in the Rogers case.

---

[1] At trial, defense counsel conceded during closing arguments that the cause of death was really only relevant to "negate premeditation" because "it's very difficult to premeditate killing somebody by giving them a heart attack."

I think the evidence presented in the case before the jury does not set forth the kind of involuntary manslaughter factual scenario that fits the legal requirements for that offense.

So I am going to deny the requested instruction for involuntary manslaughter.

The trial court properly declined to give an instruction on involuntary manslaughter based on the facts of this case. "Involuntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Mendoza*, 468 Mich at 536. No evidence was presented that the death was caused by an unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some lawful act. Defendant struck the victim on the head numerous times and strangled him with his hands. This evidence clearly showed either an intent to kill or intent to cause great bodily harm, and an involuntary manslaughter instruction was not supported by a rational view of the evidence.

## B. UNANIMOUS JURY

Defendant points out that the felony information in this case did not provide alternate theories for first-degree home invasion. The information provided that defendant "did break and enter *and* enter without permission." Defendant argues that, under those circumstances, the jurors had to find both a break-in *and* an entry without owner's permission, beyond a reasonable doubt and the trial court's instruction otherwise was erroneous. We disagree.

"[J]ury instructions that involve questions of law are reviewed de novo." *Gillis*, 474 Mich at 113.

At a pretrial motion to quash in which defense counsel asked the trial court to dismiss the felony-murder charge because there was no evidence of an underlying felony, the prosecutor noted: "Counsel argues that I have to prove that there was a breaking and entering to establish a home invasion first degree. Sometimes I do. But a home invasion first degree can also be based on an entering without permission." Defense counsel conceded that the prosecution could pursue an alternate theory but it still had to prove that the person was there unwanted.

During preliminary instructions, the trial court told the jury:

Now as I indicated to you, ladies and gentlemen, for first degree felony murder you have to find that the murder took place during the perpetration or attempted perpetration of a home invasion in the first degree.

And there are two different manners in which home invasion in the first degree can occur and have been alleged by the prosecutor's office. I'm going to give you those two different theories.

The trial court proceeded to instruct the jury that a defendant could be found guilty of first-degree home invasion by either entering without permission *or* breaking into the home. Defense counsel did not object.

-9-

During closing arguments, the prosecutor told the jury, "What I['ve] got to prove to you is that Mr. Elatrache broke and entered *or* entered without permission the Aljbaili apartment . . ." During his argument, defense counsel noted: "That felony murder rests on a theory that Ali Elatrache on July 18th, either broke into that house or that apartment, *or* somehow got in there against the wishes of Mr. Aljbaili." Counsel then said that the prosecutor had only pursued the forced entry approach by arguing that there were fresh pry marks. "If the door hasn't been broken in, how do [we] get to this home invasion? Well, then I guess the theory goes back to, well, Mr. Aljbaili would have never let him in. Mr. Aljbaili let Ali Elatrache into the house 24 hours before that on the 17th. Did anything bad happen? Even [S] tells you no."

While instructing the jury on first-degree felony murder with home invasion as the underlying felony, the trial court noted:

> Now, ladies and gentlemen, let me make this remark to you with regards to the crime of home invasion in the first degree.

> There are two different theories. For this particular Count you as a jury do not have to all agree whether or not the defendant entered without permission or whether it was a breaking and entering.

> You have to be convinced beyond a reasonable doubt, however, it has to be proven to you beyond a reasonable doubt, that the defendant did one or the other.

> You all must be unanimous in that the defendant entered or while he was present or was leaving the dwelling, committed the crime of murder, and that while he entered, was present in or leaving another person, Mr. Mohammed Aljbaili, was lawfully present in the premises.

> With the remaining element though whether the defendant entered without permission or whether he broke and entered, you do not all have to agree on whether he did one or both.

> Put another way, if you are all persuaded beyond a reasonable doubt about the other two elements, and let's say, for example, seven of you are convinced beyond a reasonable doubt there this was an entry without permission, and the other five are persuaded beyond a reasonable doubt that it was a breaking and entering, that's sufficient for a guilty verdict.

> Everybody understand that? That's the one you got two different theories on that particular element. You don't have to be unanimous. You may be, but you don't have to be.

Defense counsel did not object and, other than the preserved arguments regarding voluntary and involuntary manslaughter, defense counsel indicated that "the instructions are fine."

During deliberations, the jury sent a note asking, "While the theories of home invasion can be split, does the overall verdict of home invasion have to be unanimous?" The trial court responded:

The answer to that is yes in this regard. Okay. I set out what the elements are for home invasion in the first degree. They have a number of similar elements to them, but they sort of split apart in the sense that obviously the elements of entering without permission or breaking and entering are different.

Now in order to find the defendant guilty, you have to find, you know, that the common elements, you have to find that they were proven beyond a reasonable doubt.

Then with regards to entering without permission or breaking and entering, the two different theories, you have to unanimously agree that one or the other theory has been proven beyond a reasonable doubt.

Is that clear?

I mean that if, for example, someone, if a juror were to think that it was breaking and entering, you have to be convinced beyond a reasonable doubt that it was breaking and entering.

Someone who thinks that it was entering without permission, they have to be persuaded beyond a reasonable doubt that it was without permission.

What it doesn't require is that all 12 of you agree on the same one theory.

Once again, defense counsel had no objection.

Based on the above excerpts from trial, defendant has waived the issue. "[I]n general, an appellant may not benefit from an alleged error that the appellant contributed to by plan or negligence." *People v Witherspoon*, 257 Mich App 329, 333; 670 NW2d 434 (2003). Defense counsel seems to have "undoubtedly inadvertently, created the very error that it wishes to correct on appeal." *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010). But "a party may not harbor error at trial and then use that error as an appellate parachute." *Id.* In any event, while a defendant has a right to a unanimous jury verdict, Const 1963, art 1, § 14, "[w]hen a statute lists alternative means of committing an offense which in and of themselves do not constitute separate and distinct offenses, jury unanimity is not required with regard to the alternate theory." *People v Johnson,* 187 Mich App 621, 629–630; 468 NW2d 307 (1991). Accordingly, defendant could have been properly convicted of felony murder even if some jurors believed that he broke into the apartment while others believed he simply entered without permission.

## C. PRESENTENCE INVESTIGATION REPORTS

Defendant next argues that he was denied the right to confront the witnesses against him when the trial court denied his request to produce the presentence investigation reports (PSIR) of its so-called jailhouse informant, Mark Joseph Fragel. We disagree.

Constitutional issues are questions of law that are reviewed de novo on appeal. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

MCL 791.229 provides:

Except as otherwise provided by law, all records and reports of investigations made by a probation officer, and all case histories of probationers shall be privileged or confidential communications not open to public inspection. Judges and probation officers shall have access to the records, reports, and case histories. The probation officer, the assistant director of probation, or the assistant director's representative shall permit the attorney general, the auditor general, and law enforcement agencies to have access to the records, reports, and case histories and shall permit designated representatives of a private contractor that operates a facility or institution that houses prisoners under the jurisdiction of the department to have access to the records, reports, and case histories pertaining to prisoners assigned to that facility. The relation of confidence between the probation officer and probationer or defendant under investigation shall remain inviolate.

Citing this court rule our Court has nevertheless held:

[W]e must conclude that the need for impeachment of criminal accusations outweighs any need for confidentiality of presentence reports. This does not mean that defendants should receive wholesale access to the confidential records of others. We hold only that when records of prior inconsistent statements of witnesses are necessary for effective cross-examination, they should be made available to the defendant. An in camera inspection procedure should be utilized by the court to limit disclosure to those statements materially inconsistent with the witness's testimony. [*People v Rohn*, 98 Mich App 593, 600; 296 NW2d 315 (1980), overruled on other grounds *People v Perry*, 460 Mich 55, 64; 594 NW2d 477 (1999).]

In *People v Stanaway*, 446 Mich 643, 650; 521 NW2d 557 (1994), our Supreme Court acknowledged the difficulty in protecting confidential records with a defendant's right to obtain evidence relevant to his defense. Ultimately, the Court held "that where a defendant can establish a reasonable probability that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense. Only when the trial court finds such evidence, should it be provided to the defendant." *Id.*

At trial, Fragel testified that he and defendant were together in an eight-member "pod" at the Wayne County jail for approximately two months. They were friendly and had shared interests. Defendant told Fragel that the victim did not approve of his relationship with S. Defendant referred to S's father as "piece of s***, dog, swine." When they talked about defendant's case, Fragel told defendant he needed an alibi. Defendant seemed unfamiliar with the term and said, "What do you mean? It was me. I did it." Defendant told Fragel that he used gloves and there would be no DNA evidence. Defendant indicated that "things got out of hand." He told Fragel that the victim "went down quick" and that he "finished him off with a belt." Fragel testified that "[i]t was all done with fists, pretty vague, just beat his a** was the way it was worded. Put his hands around his neck."

Defendant told Fragel that he went to Canada and bought tickets to go to Lebanon but then changed his mind and decided to stay at a hotel because he did not want to leave his family and he was sure there was nothing to link him to the crime. Defendant told Fragel that he was "pretty sure that he was going to get it knocked down to manslaughter, get a bond and then take it from there." Defendant intended to "split" if he got out on bond. Fragel testified that defendant "[s]tarted making just like

threats toward you, [the prosecutors], as well as Detective Delgreco . . .When he got out of there, when he was back in the Middle East, he was going to take a picture of his member and send it back to them like as a ha, ha type thing" and "I'm going to have them killed type stuff."

At the time of trial, Fragel was a prisoner in Jackson. He had a history of drug use, including cocaine and Xanax. Fragel admitted that he had an extensive history involving property crimes, drug offenses, and "a couple of domestic violences." He testified that he had 12 felonies and "like 16 misdemeanors." These crimes occurred in Wayne, Washtenaw and Saginaw counties. In exchange for testifying against defendant, Fragel was able to plead to larceny from an automobile when the original charge was first-degree home invasion; he was an habitual fourth offender. Fragel was the one who came forward because "I thought the deal I had on the table sucked, and it also seemed like the right thing to do."

In a pretrial motion, defense counsel requested that the trial court order the prosecutor to produce all of Fragel's past PSIR's because, while defense counsel knew Fragel had a number of prior felonies in Washtenaw, Saginaw and Wayne Counties, Fragel may have had other convictions in other states and federal court. PSIR's would also reveal misdemeanor and juvenile convictions, as well as psychiatric history. The trial court told counsel that it "[s]ounds like you're fishing." Defense counsel suggested an in camera review. The trial court denied the motion:

> In this particular case given great [deference] certainly to [defense counsel's] expertise and as a criminal defense lawyer, this Court concludes that it doesn't meet the <u>Stanoway</u> [sic] requirement of establishing a reasonable probability that privileged records are likely to contain material information necessary to the defense.

> Now certainly that doesn't exempt the prosecution's office from highly disclosing any <u>Brady</u> material, and that certainly with sanctions could be severe. But at this particular point there is speculation and supposition about what might exist in some other location or what records might contain.

> But it doesn't meet the threshold as set forth in <u>Stanoway</u> [sic].

> This case is different from the <u>Rohn</u> case. Where the <u>Rohn</u> case it was a co-defendant who was in fact the subject of the Presentence Report interview and giving a statement in a case in which he was going to testify against Mr. Rohn.

> Certainly there was reason at that point to find out what the defendant said in his Presentence Report interview because it might very well provide possible impeachment that could be used when the co-defendant took the stand.

> That is not the case here. Mr. Fragel was an inmate. He's not a co-defendant of Mr. Elatrache, and would not be giving any kind of information that this Court could reasonably conclude that would be related to this particular homicide.

The trial court's conclusion was correct. As a preliminary matter, there is absolutely no evidence that the prosecutor had any of the alleged documents in his possession. Additionally, defendant failed to indicate how Fragel's PSIR's would contain relevant information to his case. Defendant's "generalized assertion of a need to attack the credibility of his accuser [does] not establish the threshold showing of a

reasonable probability that the records contain information material to his defense sufficient to overcome the various statutory privileges." *Stanaway*, 446 Mich at 650.

### D. THE PROSECUTION'S OPENING STATEMENT

Defendant argues that the prosecutor committed misconduct when he made an inflammatory opening statement regarding defendant's relationship with S and the allegation that defendant intended to have the prosecutors and investigation officer killed. We disagree.

"This Court reviews claims of prosecutorial misconduct case by case, examining the remarks in context, to determine whether the defendant received a fair and impartial trial." *People v Aldrich*, 246 Mich App 101, 110; 631 NW2d 67 (2001).

In *People v Bahoda*, 448 Mich 261, 266-67; 531 NW2d 659 (1995), our Supreme Court admonished that any remarks made by a prosecutor simply to "arouse the prejudice of jurors" are improper because it could "lead to a decision based on prejudice rather than on the guilt or innocence of the accused." It added that courts will "not hesitate to reverse where potentially inflammatory references are intentionally injected, with no apparent justification except to arouse prejudice." *Id.* In order to review such a claim, an appellate court "examines the remarks in context to determine whether they denied defendant a fair trial." *Id.*

During the prosecutor's opening statement, he repeatedly used the phrase "[w]elcome to hell. F*** off." The prosecutor also used the term "sharmoota," which is Arabic for slut. The prosecutor called defendant the "psychotic sociopathic jealous boyfriend from hell." In contrast, the prosecutor referred to S and her father as a "[n]ice young lady and her elderly father." The prosecutor cited from defendant's texts that used the terms "b****, slut, whore, c*** sucker." Claiming that defendant murdered the victim as a means of punishing and controlling S, the prosecutor referenced the prior break ins, phone calls, use of credit cards. When talking about Fragel's testimony, the prosecutor indicated:

> You'll hear that Mr. Elatrache had a little plan that he shared with Mr. Fragel. He thought he was going to get the previous Judge, Judge Bill, to reduce his charges down to like manslaughter, murder two.

> Then he was confident he could get out on bond, contact somebody from the Homeland Security to get him a bogus passport, and then he was going to take a trip back to Lebanon as soon as he killed Trisha, killed me and killed the detective.

Once opening statements concluded, defense counsel moved for a mistrial based on the fact that the prosecution's opening "was totally argumentative, went completely over the top. And because it concentrated so much on the evidence as to what Ali Elatrache may have done to [S], which is a completely side issue in this case . . ."[2] The trial court denied defendant's motion:

---

[2] Counsel explained that he did not object because it was "very difficult to pick a point where you could have objected. The harm had been done. It merely escalated. That's why I didn't object, and because I couldn't have done any good, only call it to the jury's attention what was going on." (9/23/14, p 95.)

-14-

Well, in this particular case I think certainly [the prosecutor] used big, not only graphic but at times dramatic expressions, in terms of explaining what he believed that the jury was going to hear.

I think there is no question that there was some considerable portion of the opening statement that was devoted to the relationship between Mr. Elatrache and Ms. Aljbaili.

But I do think that as the opening statement indicated, that the threats and the communications to Ms. Aljbaili were inextricably linked to the People's theory of the killing of [S's] father.

Many of the communications to [S] by the defendant were expressions that he was going to kill the deceased in this particular case. They were repeated comments. They were said in advance, months in advance of this particular date of the deceased death.

That certainly, I think, goes in fairly graphic form. It is the defendant's own words on . . .recorded telephone conversations or text messages that set forth what could be the element of deliberation with regard to premeditation and deliberation.

Defendant was not denied a fair trial. The prosecutor did nothing more than repeat defendant's own words. Additionally, the prosecutor did not make any statements that were not subsequently supported by the evidence presented during trial. As will be discussed further below, defendant's conduct towards S was highly relevant to the crime and formed the foundation of the case against defendant. The prosecutor did nothing improper.

## E. EVIDENCE OF DEFENDANT'S BEHAVIOR TOWARDS S

Defendant argues that the trial court erred when it permitted the prosecution to present evidence of other acts defendant committed, including aggravating stalking, several break-ins and credit card fraud because the behavior was directed toward S, not the victim. Defendant further argues that the trial court should have granted a severance of the stalking charge and should have allowed defendant to plead no contest to the charge. We disagree with each of defendant's contentions.

This Court reviews for an abuse of discretion a trial court's decision to admit so-called bad acts evidence. *People v McGhee*, 268 Mich App 600, 636; 709 NW2d 595(2005). A trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

### 1. DEFENDANT'S MOTION TO SEVER

Prior to trial, defense counsel moved to sever the aggravated stalking charge from the other charges. Defense counsel argued that the prosecution was using the evidence of defendant's conduct toward S to bolster its murder case, which was unrelated. The prosecutor responded that the victim's murder was simply the ultimate harassment that S suffered in that defendant "killed her father, he did what he knew would hurt her, the most. The ultimate aggravated stalking, your Honor, he murdered her father." The trial court denied defendant's motion to sever: "I think they are intertwined. The court

rule mandates, especially in the light of the efficient administration of justice that joinder is proper and required in this case."

Pursuant to MRC 6.120(C), "[o]n the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1)." MCR 6.120(B)(1) provides:

> Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on:
>
> (a) the same conduct or transaction, or
>
> (b) a series of connected acts, or
>
> (c) a series of acts constituting parts of a single scheme or plan.

"To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). So-called "misjoinder" rises to the level of a constitutional violation if it results in the deprivation of a fair trial. *People v Williams*, 483 Mich 226, 246; 769 NW2d 605 (2009).

Although the jury ultimately acquitted defendant of first-degree premeditated murder, defendant's actions prior to the murder –whether aimed at S or aimed at the victim – were relevant to premeditation and deliberation. The trial court did not err in denying defendant's motion to sever where the complained-of actions were related to the homicide.

## 2. DEFENDANT'S REQUEST TO PLEAD NO CONTEST

At another pretrial hearing, defendant indicated a desire to plead no contest to the aggravated stalking charge. The new trial judge noted that defendant appeared to be trying to "back door" the previous severance ruling. It denied defendant's request to enter a no contest plea to aggravating stalking:

> I think when one looks at the fact that no-contest pleas are at the discretion of the Court, that I think solidifies the notion that there is the presumption that there is to be some inculpatory consequence or sanction for any kind of plea, that there is a presumption that the defendant is going to plead guilty.
>
> That no-contest pleas there needs to be some sort of articulable basis for that particular no contest, and most often that occurs because either defendant doesn't have any firm memory of the particular offense, maybe because of an injury.
>
> Sometimes defendants don't have a memory of a particular type of offense, such as a home invasion because they've done so many of them that they can't exactly remember the details of each and every one.
>
> Or there are instances in which civil liability may be an overwhelming or a compelling circumstance that would justify a guilty plea or a no-contest plea.

-16-

In this particular case in terms of the justification for permitting Mr. Elatrache to enter a no-contest plea, I don't find are there. I don't see any reason that convinces this Court that it justifies taking anything other than a guilty plea with regards to the charge of aggravated stalking, or to let the matter go forward and let the proofs be what the proofs are and let the jury decide this particular matter.

But I'll certainly let the defense objection be noted, and it's preserved. But the exercise of my discretion I don't find the justification for a sufficient reason for permitting a no-contest plea.

Defendant then pleaded guilty to aggravated stalking. In particular, he admitted that he sent S more than one text message threatening that he would kill her or do her great bodily harm and that S took those messages seriously. The prosecutor moved to enter into evidence a certified copy of defendant's plea into evidence. The trial court denied the motion because there had already been "volumes of evidence" regarding the issue and it would be cumulative and potentially confusing to the jury.

"A defendant may enter a plea of nolo contendere only with the consent of the court." MCR 6.301(B). Therefore, "[a]cceptance of a nolo contendere plea is a matter of grace, not of right." *People v Sammons*, 191 Mich App 351, 369; 478 NW2d 901 (1991). There is simply no reason for defendant to argue that he was entitled, as a matter of law, to enter a no contest plea.

### 3. 404(b) EVIDENCE

Immediately following defendant's guilty plea, the trial court addressed whether the other acts evidence should be admitted under MRE 404(b). The prosecutor argued that the evidence was proper because it was probative of motive, identity, premeditation, and lack of accident. The trial court ruled as follows:

In this particular case the prosecution has made reference with regards to voice mail messages and text messages and other alleged admissions by the defendant of an ongoing, deep animosity toward [S] that particularly manifested itself when there was an inability on the part of the defendant to control Ms. Aljbaili.

The effort to control, which, as the prosecutor set forth, vacillates between gifts and efforts to win over the affection and favor of Ms. Aljbaili to the issue of threats, not only of harm but threats of death, not only toward Ms. Aljbaili but also toward her mother and father.

The number of communications that involved threats to both certainly reflect, when I say both, I mean Ms. Aljbaili and her family, indicate to this Court that the threats to Ms. Aljbaili and the relationship to this particular homicide are very closely intertwined and that they cannot be separated one from another.

Certainly in this Court's view the threats toward Ms. Aljbaili go toward the motive for the homicide in this particular case. I think it also does go toward the issue of a premeditated intent to kill, indicating that as Mr. Reynolds has set forth in his offer of proof, that the defendant communicates with [S] that he was meeting with her father.

That's shortly before the homicide, and an intervening fact after that communication, the homicide, [S] is in communication with the defendant's brother in an effort to get the defendant to just leave her alone.

The jury I think is entitled to know whether or not that's fuel, the issue that fueled the issue of Mr. Elatrache's anger at Ms. Aljbaili asserting herself and trying to separate and end a relationship over what is offered as a very controlling individual.

And I do think that the threats directed toward Ms. Aljbaili and her family repeatedly directed toward the notion of I will kill you, and I will kill your father. I will kill your mother, and I will kill your father also goes to the notion of whether or not this was an accidental death, whether Mr. Aljbaili passed away as a result of a heart attack during some minor tussle or whether or not it was in fact a premeditated murder.

It does seem to this Court that the VanderVliet criteria have been met. That this evidence is not being just introduced to show that Mr. Elatrache is a bad person or that he has a propensity to commit crime.

Certainly the issue of motive and intent and the lack of accident are relevant under Michigan Rule of Evidence 402 as to a fact of consequence in this trial.

Certainly I take the defense's point that there certainly is a huge volume of communications and evidence that demonstrates these other acts, but I don't think the volume of evidence, as long as it is relevant, makes it so unduly prejudicial that it substantially outweighs the probative value of the evidence.

The evidence as proffered by the People I think demonstrates that the persistence and the intensity and volume of the communications to [S] demonstrate the motive and the premeditated intent and offers evidence of a lack of accident.[3]

During S's testimony, when she was just about to testify regarding the prior break-ins, the trial court instructed the jury that it must be careful to consider the evidence for its limited purpose. The other acts evidence was presented as set forth in the statement of facts.

During the prosecutor's closing arguments, she noted: "The defense would like you to think this case has absolutely nothing to do with [S], but that's ludicrous. This case has everything to do with her. But for that relationship, we wouldn't be here." She added that defendant "sadistically" went after the individual most precious to S in order to have her rely on him and need him for protection.

Generally, character evidence cannot be used to show that a defendant acted in conformity therewith because there is a danger that a defendant will be convicted solely upon his history of

---

[3] The trial court further found that the evidence did not meet the criteria for being admitted as evidence of identity.

misconduct rather than on his conduct in a particular case. *People v Starr*, 457 Mich 490, 495; 577 NW2d 673 (1998). MRE 404(b) therefore provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

However, MRE 404(b) does not prohibit all other-acts evidence that may give rise to an inference about the defendant's character, but only that which is relevant *solely* to the defendant's character or criminal propensity." *People v Jackson*, 498 Mich 246, 276; 869 NW2d 253, *reh den* 498 Mich 879 (2015) (internal quotation marks omitted).

Generally, to be admissible under MRE 404(b), bad acts evidence (1) must be offered for a proper purpose, (2) must be relevant, and (3) must not have a probative value substantially outweighed by its potential for unfair prejudice. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). A proper purpose is one other than establishing the defendant's character to show her propensity to commit the offense. *People v Johnigan*, 265 Mich App 463, 465; 696 NW2d 725 (2005).

"Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001). Under this broad definition, evidence that is useful in shedding light on any material point is admissible. *Id.* at 114. However, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The trial court did not abuse its discretion when it permitted the prosecution to present other acts evidence. The evidence was offered for a proper purpose and was highly relevant. It was not offered for the sole purpose of showing that defendant was a bad person. Instead, it was offered to give context to the crime itself. Defendant's behavior demonstrated motive, and was especially relevant to premeditation. While the evidence was undoubtedly prejudicial in that the jury heard what horrible things defendant said and did before the murder, it cannot be said that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

## F.  EFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel at trial because counsel failed to object to Fragel's testimony that defendant told him he was going to have the prosecutors and the lead detective on the case killed. Defendant further argues that counsel was deficient in failing to request an accident instruction. We disagree.

"[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." Because defendant did not move for a

*Ginther*[4] hearing, our review is limited to "mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

> A criminal defendant has the fundamental right to effective assistance of counsel. However, it is the defendant's burden to prove that counsel did not provide effective assistance. To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant. The defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. [*Id.* (internal footnotes omitted).]

"A defense attorney must enjoy great discretion in the trying of a case – especially with regard to trial strategy and tactics." *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). "Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).

Because there was no *Ginther* hearing, we are left to guess defense counsel's thoughts. It is very likely, as the prosecutor points out, that defense counsel decided not to object to Fragel's testimony as a tactical matter in order to avoid drawing additional attention to it. As for the accident instruction, Section II(A) of this opinion addressed the lesser included offenses of voluntary and involuntary manslaughter. The record did not support an accident instruction for the same reason the record did not support manslaughter instructions. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120, 125 (2010).[5]

Affirmed.

/s/ Jane M. Beckering
/s/ Donald S. Owens
/s/ Kirsten Frank Kelly

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] We note that defendant received zealous representation over the course of this two-week trial. When sentencing defendant, the trial court noted: "I think that Mr. Elatrache was very fortunate. I don't think he could have had any better representation in this case than he had from Mr. Howarth in particular, as well as Ms. Silver and Mr. Paglia."